**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CONSTANCE MURRAY, | CASE NO. 5:24-CV-00639 |
| Plaintiff, | |
| vs. | DISTRICT JUDGE PAMELA A. BARKER |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Constance Murray ("Plaintiff" or "Ms. Murray") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying their application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.      Procedural History

Ms. Murray filed her DIB application on January 19, 2022, alleging a disability onset date of August 13, 2021.  (Tr. 185-97.)  She asserted disability due to enlargement of thyroid gland, anxiety, posttraumatic stress disorder, heart palpitations, panic attacks, insomnia, depression, and loss of balance or unsteadiness.  (Tr. 189.)  Her application was denied at the initial level (Tr. 73) and upon reconsideration (Tr. at 82), and she requested a hearing (Tr. 94).  A hearing was held before an Administrative Law Judge ("ALJ") on May 2, 2023.  (Tr. 33-51.)

1

The ALJ issued a decision on May 18, 2023, finding Ms. Murray was not under a disability within the meaning of the Social Security Act since January 3, 2022, the date her DIB application was protectively filed.  (Tr. 15-32.)  Ms. Murray requested review of the ALJ decision (Tr. 162-64), which was denied by the Appeals Council on February 23, 2024 (Tr. 1-5), making the ALJ's decision the final decision of the Commissioner.  Ms. Murray then filed the pending appeal (ECF Doc. 1), which is fully briefed and ripe for review (ECF Docs. 7, 9, 10).

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Murray was 50 years old on her alleged onset date, making her an individual closely approaching advanced age under Social Security regulations.  (Tr. 65.)  She completed two years of college and reported past work as a correctional officer and a pre-GED instructor.  (Tr. 190.)  She has not engaged in substantial gainful activity since the alleged onset date.  (Tr. 20.)

### B.      Medical Evidence

#### 1.      Relevant Treatment History

Between February and April 2018, Ms. Murray attended four counseling sessions at Wives Self Help Foundation, Inc., in Philadelphia.  (Tr. 297-315.)  She dropped out of therapy after several months and showed minimal improvement with treatment.  (Tr. 297.)  She reported to her counselors that her anxiety was due to stressors at work.  (*See, e.g.*, Tr. 309, 311, 313.)

On November 16, 2021, Ms. Murray attended a telephonic appointment with primary care provider, Larry Kramer, D.O., at Temple Health.  (Tr. 484-86.)  Because it was an audio-only encounter, Dr. Kramer did not conduct a physical examination.  (Tr. 486.)  Ms. Murray reported that she was supposed to return to work but had developed a rapid heartbeat and felt anxious.  (Tr. 484.)  She requested a letter stating she could not return to work due to her

symptoms.  (*Id.*)  Plaintiff's review of systems was positive for sleep disturbance and being

nervous/anxious.  (Tr. 486.)  Dr. Kramer diagnosed anxiety/depression, advised "[n]o work," and

recommended a physical examination and follow up with a mental health professional.  (*Id.*)

On November 30, 2021, Ms. Murray attended an in-person appointment with Dr. Kramer.

(Tr. 491-96.)  She endorsed a rapid heart rate that she heard "in her ears."  (Tr. 491.)  Her review

of systems was positive for palpitations and being nervous/anxious.  (Tr. 492.)  On examination,

her blood pressure was 120/90, and she weighed 243 pounds with a BMI of 36.00.  (*Id.*)  She

was alert, had a normal mood/affect, normal range of motion, and normal heartbeat rhythm.  (Tr.

492-93.)  Dr. Kramer diagnosed Plaintiff with "anxiety state, stable now" and "symptoms of

rapid heartbeat."  (*Id.*)  He prescribed Melatonin and ordered a mental health evaluation, an

electrocardiogram ("ECG" or "EKG"), and a sleep study.  (Tr. 493.)

Ms. Murray next attended a telephonic appointment with Dr. Kramer on December 7,

2021, following up on an emergency room visit at which she reported "sharp upper chest area

pain."  (Tr. 498-99.)  She reported to Dr. Kramer that her ECG was negative.  (Tr. 498.)  Her

review of systems was positive for chest pain, but otherwise unremarkable.  (*Id.*)  As it was an

audio-only visit, Dr. Kramer did not perform a physical exam.  (*Id.*)  He diagnosed Ms. Murray

with muscular pain and told her to follow-up with an office visit if it reoccurred.  (Tr. 499.)

On December 16, 2021, Plaintiff attended an initial mental health assessment at Path, Inc

("Path") with therapist Sandra Elliott.[1]  (Tr. 471-80.)  She complained of stress, anxiety, and

insomnia.  (Tr. 471.)  Her reported symptoms included rapid heartbeat, fear, panic, sweaty

palms, thinking that "something is going wrong," excessive worrying, and difficulty falling

asleep until 2:00 or 3:00 am.  (*Id.*)  She also endorsed obsessions/compulsions, specifically

---

[1] The assessment, as well as future treatment records from visits with Ms. Elliot, were reviewed and signed by
Colleen Roberts, LCSW and/or Stuart Levinson, MD.  (Tr. 480, 447.)

rearranging cups after eating at a restaurant.  (Tr. 474.)  Plaintiff reported these problems began after she witnessed a prison riot in July 2021 during which the inmates said they planned to rape the female guards.  (Tr. 471.)  She stated she had flashbacks, describing "blood and screams everywhere."  (*Id.*)  She also noted that her supervisor at the prison had bullied her, and she was exposed to "constant fighting by the inmates."  (Tr. 478.)  Ms. Murray described herself as "affectionate, friendly, leader, outgoing" in her relationships with others.  (Tr. 477.)  Her mental status examination was normal, with a full range of mood/affect, normal speech, logical thought processes, fair insight, and intact judgment.  (Tr. 479.)  It was recommended that she attend weekly therapy sessions, medication management with Steven Levinson, M.D., and a psychological evaluation.  (*Id.*)

On January 10, 2022, Plaintiff attended a video therapy session with Ms. Elliott.  (Tr. 441-47.)  She reported insomnia and an increase in anxiety symptoms, particularly while driving on the highway; she used deep breathing to help her function.  (Tr. 441.)  She also reported great relationships with her children.  (Tr. 443.)  She said her recovery goals were to "find relief, understand-self, develop self-confident [sic], and build rapport with [her] doctor."  (Tr. 446.)

Also on January 10, 2022, Plaintiff attended a psychiatric evaluation via video with Stuart Levinson, M.D., at Path.  (Tr. 454-62.)  Ms. Murray told Dr. Levinson about her traumatic experience at work in July 2021, when she was working as a corrections officer in a jail.  (Tr. 454.)  She explained that she witnessed two inmates begin to fight at a time when she was the only female in an isolated area "with over 300 men."  (*Id.*)  The area had only one exit, so she called for assistance.  (*Id.*)  While waiting for the response team, she "heard yelling of obscenities to sexually assault" and feared she "would be killed and raped" since only three correctional staff were present and pepper spray was not helping.  (*Id.*)  After this incident, she

4

said she became anxious and jittery and "kept going to the bathroom."  (*Id.*)  She took a leave of absence from work and saw a doctor, who cleared her only for non-inmate work.  (*Id.*)  As none existed, she was medically discharged from her job.  (*Id.*)  Ms. Murray complained of anxiety, stress, and only sleeping five to six hours a night.  (Tr. 454.)  She reported symptoms of irritability, less interest in activities, avoidance of driving over bridges, discomfort around large groups of people, failure to care for her hair for two to three months and experiencing feelings of hypervigilance.  (*Id.*)  She also endorsed decreased energy levels, increased anxiety with panic attacks, difficulty falling asleep, difficulty in activities of daily living, and difficulty concentrating.  (Tr. 455-56.)  Mental status examination findings indicate that she presented with an anxious and depressed mood, but her speech was normal, her thought processes were logical, she had no impairments of cognition, and her insight and judgment were intact.  (Tr. 458-59.)  Dr. Levinson diagnosed Ms. Murray with PTSD and prescribed Sertraline 50 mg.  (Tr. 460.)

On February 1, 2022, Plaintiff attended a telephonic treatment visit with Dr. Kramer for the completion of her disability forms.  (Tr. 504-06.)  She reported ongoing symptoms of insomnia, depression, PTSD, heart palpitations, and dysphagia.  (Tr. 504.)  She was seeing a mental health provider and taking Zoloft.  (*Id.*)  Her review of systems was negative for chest pain and positive for palpitations, sleep disturbance, and being nervous/anxious.  (Tr. 505.)  Dr. Kramer completed disability forms and diagnosed Plaintiff with palpitations, hot flashes, PTSD, goiter, dysphagia, insomnia, and depression.  (*Id.*)  He recommended that she schedule an in-office exam and follow-up with her mental health provider.  (*Id.*)

On May 4, 2022, Ms. Murray attended a telehealth medication management appointment with Dr. Levinson.  (Tr. 463-66.)  She endorsed intermittent anxiety that was "not as intense and bearable."  (Tr. 463.)  She reported having dreams about her prison job but said she would not

call them nightmares; she said she tried not to think about it.  (*Id.*)  She said her therapist was helping her feel better, and she remained able to visit family, clean, and workout.  (*Id.*)  She reported having a panic attack when she tried to drive on the highway that lasted until she could exit the highway.  (*Id.*)  She described her sleep as "okay mostly" but said it varied depending on the day.  (*Id.*)  She said she checked the stove twice and the door when leaving her house; Dr. Levinson noted this appeared to be trauma related rather than obsessive/compulsive disorder. (*Id.*)  On mental status examination, Ms. Murray displayed adequate attention and concentration, presented with a congruent and appropriate mood/affect, and appeared less depressed and anxious.  (Tr. 465.)  Dr. Levinson continued her on Sertraline.  (*Id.*)

On June 15, 2022, Plaintiff saw Dr. Kramer for her annual physical exam.  (Tr. 507-10.) Her review of systems was negative for chest pain and palpitations and positive for sleep disturbance and being nervous/anxious.  (Tr. 508.)  She had a blood pressure of 120/72, weighed 243 pounds, and had a BMI of 35.88.  (*Id.*)  Her physical examination was unremarkable; notably, her heart rate and rhythm, mood and behavior were normal.  (Tr. 509.)  Dr. Kramer diagnosed her with thyroiditis and ordered various tests for her thyroid.  (Tr. 510.)  He made no medication changes.  (*Id.*)

On August 31, 2022, Ms. Murray developed a treatment plan at Path with Sharla Taliaferro, M.A.  (Tr. 450-51.)  Ms. Taliaferro noted that Plaintiff's mood had been stable with medication and coping strategies.  (Tr. 450.)  She also noted that Ms. Murray "[c]ontinue[d] to struggle with depression and anxiety."  (*Id.*)  Ms. Murray reported that her mood was up somedays and down other days, and her anxiety was "terrible."  (Tr. 450-51.)  She was encouraged to use coping strategies to decrease her anxiety.  (Tr. 451.)

Ms. Murray attended a telehealth medication management appointment with Dr. Levinson on November 3, 2022.  (Tr. 438-39.)  She had not seen Dr. Levinson since May 4, 2022.  (Tr. 438.)  She said that she did not realize she was supposed to schedule appointments and felt "frustrated and irritable about not having a therapist for 2 weeks."  (*Id.*)  She reported staying awake until 3:00 am because of "[p]roblem solving at night," but said melatonin helped.  (*Id.*)  She asked to restart Sertraline.  (*Id.*)  Dr. Levinson diagnosed her with PTSD, noting the following symptoms: "trauma, insomnia, anxiety, depression, feels unable to work and on disability private policy."  (Tr. 439.)  He prescribed Sertraline 50 mg, once per day.  (*Id.*)

At a primary care appointment with Dr. Kramer on April 3, 2023, Plaintiff complained of being "under a lot of stress" and having a recent "vague episode of chest pain."  (Tr. 514.)  She requested an ECG.  (*Id.*)  Her review of systems was positive for chest pain, but otherwise negative.  (*Id.*)  She had a blood pressure of 120/88, weighed 242 pounds, and had a BMI of 35.74.  (*Id.*)  Her physical examination was normal.  (Tr. 515.)  Dr. Kramer assessed Plaintiff with anxiety and vague chest pain and ordered an ECG.  (*Id.*)  Ms. Murray underwent the ECG that same day, and it was normal.  (Tr. 629-30.)

## 2. Opinion Evidence

### i. Consultative Medical Examiner

On May 19, 2022, Ms. Murray attended a consultative medical examination with Anne M. Greenberg, M.D.  (Tr. 351-68.)  In addition to interviewing and examining Ms. Murray, Dr. Greenberg reviewed a February 2022 Third Party Function Report and a written history form.  (Tr. 351-52 (referencing Tr. 224-31, 365-66).)  Ms. Murray told Dr. Greenberg she had "an extensive psychiatric history with diagnoses including anxiety, panic attacks with palpitations, and depression" and PTSD.  (Tr. 351, 365.)  She also reported that she saw a therapist weekly,

saw a psychiatrist every two to three months, and recently started taking Sertraline.  (Tr. 351.)
Dr. Greenberg noted that Plaintiff was also being treated for a goiter and hypothyroidism.  (*Id.*)

Regarding daily living and social activities, Ms. Murray told Dr. Greenberg that she lived
alone and did not need help at home.  (Tr. 352, 366.)  She indicated she was licensed to drive and
continued to drive a car.  (*Id.*)  She also indicated that she could cook, clean, do laundry, shop,
and care for her hygiene without assistance.  (*Id.*)  Ms. Murray reported that to relax, she watches
television, reads, listens to the radio, plays video games, and shops.  (*Id.*)

On physical examination, Plaintiff weighed 256 pounds, and her blood pressure was
122/80.  (Tr. 352.)  She had normal gait and stance, regular heartbeat, full squat, no reflex or
sensory deficits, full strength, and 100% grip.  (Tr. 352-53.)  She did not need help getting on
and off the exam table and could rise from a chair without difficultly.  (Tr. 353.)  Dr. Greenberg
noted that Plaintiff's knee x-rays were negative.  (Tr. 354.)  She diagnosed Plaintiff with thyroid
goiter, anxiety, panic attacks, depression, PTSD, history of AA, and nicotine use disorder.  (*Id.*)

Dr. Greenberg completed a checkbox-style medical source statement of Plaintiff's ability
to perform work-related activities.  (Tr. 355-60.)  She opined that Plaintiff was limited to the
following: occasionally lifting and carrying up to 20 pounds; frequently lifting and carrying up to
10 pounds; walking and standing up to one hour each without interruption and four hours total in
an eight-hour workday; sitting up to four hours without interruption and eight hours total in an
eight-hour workday; frequently reaching, handling, fingering, feeling, and pushing/pulling;
frequently using her feet for operation of foot controls; occasionally climbing ladders or
scaffolds and frequently climbing stairs and ramps; frequently balancing, stooping, kneeling,
crouching, and crawling; occasionally tolerating exposure to unprotected heights, extreme cold,
and extreme heat; frequently tolerating exposure to moving mechanical parts, operating a motor

8

vehicle, humidity and wetness, dusts, odors, fumes, and pulmonary irritants, and vibrations; and tolerating up to a moderate noise level.  (Tr. 355-59.)  Dr. Greenberg opined that these limitations had lasted or would last for 12 consecutive months.  (Tr. 360.)  Throughout the evaluation, she left blank the sections asking her to "[i]dentify the particular medical or clinical findings (i.e., physical exam findings, x-ray findings, laboratory test results, history, and symptoms including pain, etc.)" that supported her assessment.  (Tr. 355-60.)

### ii.      State Agency Medical Consultants

On July 5, 2022, non-examining state agency medical consultant Charles Joseph Hubbard Jr., M.D., completed a medical evaluation based on the medical records.  (Tr. 67.)  After reviewing the records, including Dr. Greenberg's consultative examination report, Dr. Hubbard opined that the record did not support a severe current functional impairment in relation to Plaintiff's alleged thyroid or heart / hypertension issues, and did not establish a medically determinable impairment in relation to her alleged loss of balance.  (*Id.*)  He further opined that her obesity was not a severe impairment, noting: "BMI in mid 30's but normal exam at CE." (*Id.*)  In support of his findings, he noted that Dr. Hubbard's May 19, 2022 physical examination noted "normal gait/stance, strength, ROM, hand function."  (*Id.*)

Upon reconsideration, on October 31, 2022, non-examining state agency medical consultant Pamela Irene Gianni, M.D., completed a medical evaluation based on updated records.  (Tr. 76.)  New treatment records included a May 4, 2022 endocrinology visit noting that Plaintiff's goiter had grown, her recent thyroid was "low level," and no medicine was needed. (*Id.*)  After reviewing the complete record, Dr. Gianni agreed with Dr. Hubbard's finding that Plaintiff had no severe medically determinable physical impairments.  (*Id.*)

### iii. State Agency Psychological Consultants

On April 1, 2022, state agency psychological consultant Nancy Kennedy, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 68) and Mental RFC Assessment (Tr. 70-71).  In the PRT, Dr. Kennedy found Ms. Murray had: mild limitations in understanding, remembering, or applying information and in adapting or managing herself; and moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace.  (Tr. 68.)  In the mental RFC, Dr. Kennedy opined as follows:

> The claimant can understand, retain, and follow simple instructions (i.e., perform one and two step tasks). The claimant can make simple decisions and would not require special supervision in order to sustain a work routine. The claimant can perform simple, routine, repetitive tasks in a stable environment.
>
> The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant is capable of asking simple questions and accepting instruction. The claimant is able to interact appropriately with the general public. The claimant is able to get along with others in the workplace without distracting them. The claimant can exercise appropriate judgment in the workplace.
>
> . . .
>
> The claimant is able to meet basic mental demands on a sustained basis despite the limitations resulting from the impairments.

(Tr. 71.)

On reconsideration, on October 20, 2022, state agency psychological consultant Richard W. Williams, Ph.D., agreed with Dr. Kennedy's PRT (Tr. 77-78) and mental RFC (Tr. 79-80).

## C. Function Reports

### 1. Function Report-Adult

Ms. Murray completed an Adult Function Report on February 14, 2022.  (Tr. 210-17.) She reported living alone and being limited from work due to being unable to sleep and having anxiety around groups of people and while driving.  (Tr. 210.)

With respect to activities of daily living, Ms. Murray reported attending to her cat, home, and hygiene with minimal limitations.  (Tr. 211-12.)  She described her typical day as follows: she would wake up, drink water, use the restroom, watch television for a while, prepare breakfast, clean, and water her plants as needed.  (Tr. 211.)  She would spend the rest of the day talking to family and friends on the phone, listening to music, caring for her cat, eating, and watching television.  (*Id.*)  She could feed and groom her cat daily without assistance.  (Tr. 211.)  She could generally care for her personal hygiene alone with no problems, noting that when she felt depressed, she did not feel like getting out of bed, doing her hair, or eating.  (*Id.*)  She set reminders to take her medications on her phone or put them on the bathroom mirror.  (Tr. 212.)  Before her illness or injury, Ms. Murray could drive long distances alone on the highway and over bridges, read books, go to the mall, attend functions and events, and travel.  (Tr. 211.)

Ms. Murray reported that she would prepare complete meals three times per day when not stressed or worrying.  (Tr. 212.)  She stated she prepared meals every two to three days, and it took "some time" to "get everything together."  (*Id.*)  She indicated she could do her laundry once a week, clean her bathroom regularly, dust, and mop and vacuum the floors every two weeks.  (*Id.*)  Each of these activities took her one to two hours.  (*Id.*)  She did not need help or encouragement to do these things.  (*Id.*)  Her injuries or illness affected her sleep because racing thoughts made it difficult to fall asleep.  (Tr. 211.)

Depending on her needs, Ms. Murray went outside daily or only once a month.  (Tr. 213.)  She could leave her house alone and would drive when she did so.  (*Id.*)  She completed necessary shopping in stores, by phone, and by mail.  (*Id.*)

Ms. Murray was able to pay bills, count change, handle a savings account, and use a checkbook/make a money order.  (*Id.*)  Her hobbies and interests included reading, caring for her

houseplants, watching television, listening to music, and listening to mantras.  (Tr. 214.)  She engaged in these activities daily.  (*Id.*)  She spent time with others by texting or talking on the phone or through video chat.  (*Id.*)  She regularly went to the market, Walmart, and to pay the cable bill.  (*Id.*)  She needed others to remind her of plans depending on where she had to go, and she did not need someone to accompany her when she left the house.  (*Id.*)  She stated she had trouble getting along with others "who are not respectful and thoughtful."  (*Id.*)  Since her injury, illness, or condition began, she struggled to get along with or be around people.  (*Id.*)

Ms. Murray indicated she was limited by her conditions in squatting, bending, standing, walking, seeing, memory, completing tasks, concentration, understanding, and getting along with others.  (Tr. 215.)  She was right-handed.  (*Id.*)  When walking, she needed to take five-minute breaks to regain her balance.  (*Id.*)

Ms. Murray did not know how long she could pay attention, had trouble concentrating on written instructions, and could not follow spoken instructions well "at all."  (*Id.*)  When asked how she related to authority figures, she said she could "get along with anyone as long as they were not bothering [her]."  (*Id.*)  She indicated she did not handle stress well and did not like changes in routine because they altered her mood and her day.  (Tr. 216.)

### 2. Adult Function Report, Third Party

Plaintiff's daughter, Salita Montgomery, completed a Third-Party Adult Function Report dated February 25, 2022.  (Tr. 224-231.)  She reported that Plaintiff lived alone.  (Tr. 224.)

With respect to activities of daily living, Ms. Montgomery reported that Plaintiff did daily tasks like washing and cooking when she lived with Ms. Montgomery but stayed indoors worrying a lot.  (Tr. 225.)  She said Plaintiff had insomnia and would not go to sleep until 2:00 or 3:00 am.  (*Id.*)  Before Plaintiff's conditions, she had no fear of driving and went out more

around other people.  (*Id.*)  At the time Ms. Montgomery filled out the report, Plaintiff was very limited in driving distances and very anxious in crowds or with non-family-members.  (*Id.*)  Plaintiff barely slept due to her conditions and contacted Ms. Montgomery in the middle of the night for comfort when she woke up.  (*Id.*)

Plaintiff cared for a cat without assistance and stayed in her house a lot, wearing pajamas.  (*Id.*)  Ms. Montgomery checked on Plaintiff daily to ensure she was not depressed or anxious.  (Tr. 226.)  She said Plaintiff wrote herself reminder notes and set phone reminders to take medication and take care of herself.  (*Id.*)  Plaintiff prepared her own meals daily, and it took an "average" amount of time unless she became distracted.  (*Id.*)  But Plaintiff sometimes retreated from food and made less effort to make complete meals since developing her conditions.  (*Id.*)  Cleaning the house was Plaintiff's therapy; she would "obsess over [it]" and "spend a great deal of time doing repetitive cleaning."  (*Id.*)

Plaintiff did not go outside often because she feared something bad would happen if she left her house.  (Tr. 227.)  When Plaintiff left the house, she either drove or rode in a car.  (*Id.*)  Plaintiff could go out alone but often invited a friend to accompany her.  (*Id.*)  According to Ms. Montgomery, Plaintiff completed necessary shopping in stores weekly or biweekly.  (*Id.*)

Ms. Montgomery indicated that Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook/make a money order.  (*Id.*)  She said Plaintiff's hobbies and interests included reading, watching television, or listening to audiobooks while cleaning, and that she did these things daily.  (Tr. 228.)  Since Plaintiff's illness or condition began, Ms. Montgomery noticed these activities become more obsessive.  (*Id.*)  Ms. Montgomery reported that Plaintiff spent time with others on the phone or texting; she did not go anywhere regularly,

except the laundry room in her apartment building. (*Id.*) Plaintiff did not need reminders to go places, but Ms. Montgomery would double check and remind her. (*Id.*)

Ms. Montgomery reported that Plaintiff had problems getting along with others because she did not trust them. (Tr. 229.) Since the start of her illness or condition, Plaintiff had been withdrawn or irritable when communicating with people outside her small circle. (*Id.*)

Ms. Montgomery indicated that Plaintiff was limited in squatting, bending, standing, walking, kneeling, hearing, seeing, memory, understanding, following instructions, and getting along with others. (*Id.*) She reported that Plaintiff did not pay attention well if she lost interest or did not understand a concept, and she did not finish what she started. (*Id.*) She also said Plaintiff would fall asleep or became distracted when asked to follow written instructions and followed spoken instructions "a little less than average." (*Id.*) Plaintiff became very combative and on edge with authority figures and did not trust authority figures. (Tr. 230.) Plaintiff also did not handle stress well but became angry, "super-emotional," or depressed." (*Id.*) She also did not like changes in her routine. (*Id.*)

Ms. Montgomery noticed unusual fears or behaviors in Plaintiff, such as: "she always thinks of the worst possible outcome. A lot of the times her fears or conclusions doesn't [sic] make sense. She sounds paranoid." (*Id.*) She reported that Plaintiff took Zoloft, which made her spacey and confused, as well as melatonin which made her "unable to sleep." (Tr. 231.)

**D.    Hearing Testimony**

**1.    Plaintiff's Testimony**

At her May 2, 2023 administrative hearing, Ms. Murray testified in response to questioning by the ALJ and her attorney. (Tr. 33-51.) She confirmed that during the 15 years preceding the hearing, she worked for the City of Philadelphia as a corrections officer. (Tr. 38.)

14

She testified that she did not return to work at all after August 13, 2021, the alleged onset date. (*Id.*)  Earnings she received after that date represented her use of sick leave, vacation time, and Family Medical Leave Act pay.  (*Id.*)

Ms. Murray testified that her corrections officer job ended after she was in a riot.  (Tr. 44.)  After that incident, she felt she could not return to that job.  (*Id.*)  She said she was prevented from working due to the onset of panic attacks.  (Tr. 38.)  Initially, she had not known they were panic attacks; it felt like she was having a heart attack all the time, she experienced constant trouble breathing, her mind would race, her palms were sweaty, her heart would beat "so fast," she endured headaches, and she could not sleep.  (Tr. 39.)  She testified she still cannot sleep and at times she is awake for two days.  (*Id.*)  In addition to these physical symptoms, Ms. Murray said she had trouble concentrating, did not feel like herself, and had bad dreams.  (Tr. 40.)  She had panic attacks maybe three times a week.  (*Id.*)  She explained that her doctor told her there was a difference between anxiety and panic attacks, but she could not tell the difference and only knew she did "not feel right."  (*Id.*)  Three or four days before the hearing, Ms. Murray said she felt like she was having a heart attack for an hour and a half.  (*Id.*)

Ms. Murray testified that her panic attacks were sometimes random, and sometimes triggered by her thoughts, by a phone call, or by going to the store.  (Tr. 42.)  She did not feel comfortable around crowds, so she tried to stay home as much as possible.  (*Id.*)  When she experienced a panic/anxiety attack, she would walk around and try to breathe, sit down, get back up, "rock," and talk to herself to calm down.  (Tr. 41.)  She was taking medication and said it helped "sometimes, for the most part."  (*Id.*)  She explained that she took medication at night, so in the morning she was "adjusting."  (*Id.*)  Throughout the day she would practice breathing, write, listen to music, and meditate to help with her anxiety.  (Tr. 41.)  Ms. Murray testified that

her medications caused the following side effects: dry mouth, grogginess, weight gain, and feeling tired.  (*Id.*)  In addition to her mental health medication, Ms. Murray was taking melatonin, Progestin, and vitamin supplements.  (Tr. 42-43.)

Ms. Murray said her sleep was "terrible."  (Tr. 43.)  She sometimes stayed awake for two days, leaving her feeling "really jittery" and agitated.  (*Id.*)  At those times, she was "not a nice person."  (*Id.*)  If she did sleep, it was only for two to three hours; she did not have "consistent straight sleep."  (*Id.*)  She was constantly tired, and sometimes her body would "just crash."  (*Id.*)

Ms. Murray said she was prevented from working by headaches, not sleeping enough, feeling uncomfortable around people, and panic attacks.  (*Id.*)  The panic attacks made her feel like she could not breathe or concentrate on what she was supposed to do.  (*Id.*)  Her elevated blood pressure also prevented her from working.  (Tr. 45.)

The ALJ asked Ms. Murray what caused her headaches.  (Tr. 47.)  She said second-hand smoke caused the headaches when she was working.  (*Id.*)  More recently, she believed the headaches stemmed from lack of sleep.  (*Id.*)  She testified that she might stay awake multiple days two or three times in a two-week period and did not nap during the day.  (Tr. 47-48.)

Regarding her physical capabilities, Ms. Murray said she could lift 40 or 50 pounds, but did not know.  (Tr. 44.)  She became off-balance while standing and needed to sit down.  (Tr. 44-45.)  She could maybe stand for 15 minutes but felt off-balance if she was walking.  (Tr. 45.)  When asked what caused her to lose balance, Ms. Murray said her doctors told her it was ENT issues, and she had to see an ENT doctor to learn more.  (Tr. 46.)  These balance issues started two or three years before the hearing, but she did not experience them while she was working.  (*Id.*)  She said her doctors believe it related to her head and her sinuses.  (*Id.*)

16

Regarding her activities of daily living, Ms. Murray said, she does not get out of bed and does not wash herself when she feels depressed. (*Id.*) She felt depressed every day, but some days she could push herself to leave her bed and other days she could not. (Tr. 46-47.) She said she did not get out of bed the entire day two days per week on average. (Tr. 47.) Ms. Murray testified she did not have problems getting out of the house to keep appointments. (Tr. 48.) She tried to attend her doctors' appointments because "they're great to [her]." (*Id.*)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") classified Ms. Murray's past work as: correction officer, DOT 372.667-018, medium exertional level, semi-skilled, SVP 4. (Tr. 48.) The VE testified that a hypothetical individual of Ms. Murray's age, education, and work experience, with the functional limitations described in the RFC determination, could not perform Ms. Murray's past work, but could perform representative positions in the national economy, including: linen room attendant, a medium unskilled job with 47,000 positions in the national economy; janitor, a medium unskilled job with 93,000 positions in the national economy; and laborer, a medium unskilled job with more than 426,000 positions in the national economy. (Tr. 48-49.)

The VE opined that there would be no work for an individual in an unskilled position who was absent two or more days per month or off-task more than 10% of the workday; if the individual was off task exactly 10% of the workday it would be "borderline" and dependent on the employer, but less than 10% of the workday off task would be allowed. (Tr. 49-50.)

## III.  Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

18

## IV.     The ALJ's Decision

In his May 18, 2023 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.  (Tr. 20.)

2.      The claimant has not engaged in substantial gainful activity since August 13, 2021, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: anxiety and PTSD.  (*Id.*)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: routine tasks with detailed but uninvolved instructions, no contact with the public, occasional interactions with coworkers, occasional interactions with supervisors, and occasional changes in work processes or tasks.  (Tr. 22.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.      The claimant was born on December 20, 1970 and was 50 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  (*Id.*)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 27.)

---

[2] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 13, 2021, the alleged onset date, through the date of the decision, May 18, 2023.  (*Id.*)

## V.    Plaintiff's Arguments

Plaintiff presents two assignments of error on appeal.  First, she argues that the ALJ committed legal error and lacked the support of substantial evidence when she found the medical opinions of the state agency psychological consultants "generally persuasive" but did not incorporate certain of their stated limitations into the RFC.  (ECF Doc. 7, pp. 3, 14-19; ECF Doc. 10, pp. 1-4.)  Second, she argues that the ALJ erred and lacked the support of substantial evidence because she failed to give valid reasons for rejecting the medical opinion of consultative examiner Dr. Greenberg.  (ECF Doc. 7, pp. 3, 19-24; ECF Doc. 10, pp. 4-5.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether substantial evidence supports the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir.

1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of

choice within which the decisionmakers can go either way, without interference by the courts.'"

*Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

   Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**A.**  **First Assignment of Error: The ALJ Adequately Evaluated the State Agency Psychological Opinions and Any Procedural Error Under SSR 96-8p Was Harmless**

In her first assignment of error, Ms. Murray argues that the ALJ erred when she found the medical opinions of the state agency psychological consultants "generally persuasive" but did not explain why those opinions were not adopted in full.  (ECF Doc. 7, pp. 15-16.)  Specifically, Plaintiff argues that the ALJ erred by: (1) failing to include limitations to performing "one-or-two-step tasks," making "simple decisions," and working in a "stable environment" in the RFC, without explaining why those limitations were not included; and (2) failing to "properly discuss the supportability and consistency factors" in analyzing the persuasiveness of the opinions.  (*Id*. at pp. 14-19.)  The Commissioner responds that the ALJ was not required to adopt the opinions verbatim and argues that the ALJ's analysis was supported by substantial evidence, that there is no conflict between the limitations in the state agency opinions and the limitations in the RFC, and that any potential error would be harmless because the VE identified 426,000 jobs that can be performed with a limitation to one to two step tasks.  (ECF Doc. 9, pp. 14-22.)

**1.**  **Framework for Evaluating Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

22

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated her reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2. The ALJ Adequately Articulated How She Considered the Consistency and Supportability of the State Agency Psychological Opinions

The ALJ found the opinions of state agency psychological consultants Dr. Kennedy and Dr. Williams "generally persuasive," explaining:

> Nancy Kennedy, Psy.D., and Richard Williams, Ph.D., found the claimant was moderately limited in mental functioning (Exhibits 1A, 3A). The undersigned finds

these opinions are generally persuasive as they are consistent and supported by the medical examinations and claimant's testimony and reported daily activities.

(Tr. 26 (emphasis added).)

Ms. Murray argues that the ALJ "failed to properly discuss the supportability and consistency factors in relation to Dr. Kennedy and Dr. Williams' pursuant to 20 C.F.R. § 404.1520c(c)." (ECF Doc. 7, p. 17.) Specifically, she asserts that the evidentiary record supports further limitations in her mental functioning—beyond those articulated in the RFC—in light of her subjective reports of her symptoms and limitations and corroborating reports from her daughter. (Id.) She argues that this "overall evidence indicates a need for more restrictive limitations of performing one and two step tasks, simple decisions, and working in a stable environment." (Id.) The Commissioner responds that this argument "is nothing more than an improper invitation to reweigh the evidence." (ECF Doc. 9, p. 21.)

In order to articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curium)). An ALJ is also permitted to rely on previously articulated information to support her opinion analysis. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

24

Here, before discussing the persuasiveness of the medical opinions, the ALJ considered

the subjective reports of Ms. Murray and her daughter, as well as her described daily activities,

in support of finding moderate limitations in all categories of mental functioning at Step Three of

the sequential analysis (Tr. 21-22) and in support of the Step Four RFC analysis (Tr. 23).  The

ALJ then discussed the subjective reports, clinical findings, and treatment modalities described

in Ms. Murray's medical records (Tr. 24-25) before explaining:

> Considering all the evidence of record and the testimony at the hearing, the
> undersigned finds claimant can perform the full range of exertional work with
> the above listed mental limitations. The medical evidence shows claimant stopped
> working as prison guard due to a traumatic event. Treatment notes indicate that the
> claimant was advised by her Human Resources Department to not return to work,
> because there were no non-inmate positions available. Claimant testified that she
> was unable to return to work due to ongoing anxiety.
>
> The medical record shows the claimant has depression, anxiety and PTSD and is
> limited in her mental functioning []. However, overall, the claimant has had little
> mental health treatment. She had approximately 6 mental health appointments since
> 11/2021 []. This was due to claimant's misunderstanding that she had to schedule
> appointments. Despite very little mental health treatment, the record does not
> document any acute symptoms or episodes of decompensation leading to emergent
> or inpatient treatment. Additionally, the May 4, 2022, mental health treatment note
> indicates claimant had only intermittent anxiety and described it as less intense and
> was bearable []. The mental status examination on May 4, 2022, shows claimant
> was less depressed and anxious []. The mental health record generally shows
> normal examinations. Mental health records are generally limited to treatment plans
> and medication checks with no longitudinal therapy notes. Overall, the records
> indicate the claimant had improvement with treatment with some residual anxiety
> and some issues with rapid heartbeat or palpitations. She takes medications for
> anxiety and insomnia.

(Tr. 25 (citations omitted) (emphasis added).)  It was only after this discussion that the ALJ

turned to the medical opinion evidence.  (Tr. 25-26.)  As to the state agency psychological

opinions, the ALJ observed that Drs. Kennedy and Williams had both opined that Ms. Murray

was "moderately limited in mental functioning," and found those opinions "generally

persuasive" because they were "consistent and supported by the medical examinations and

claimant's testimony and reported activities."  (Tr. 26.)

25

Although the ALJ's analysis of the state agency psychological opinions was brief, it was informed by her prior written analysis of Ms. Murray's subjective reports and treatment records. The ALJ had already considered Ms. Murray's self-reported limitations and activities in finding she had moderate limitations in all four categories of mental functioning.  (Tr. 21-22.)  The ALJ had also already considered Ms. Murray's subjective complaints and treatment records in support of her finding that Ms. Murray could perform tasks within the following mental RFC:

> routine tasks with detailed but uninvolved instructions, no contact with the public, occasional interactions with coworkers, occasional interactions with supervisors, and occasional changes in work processes or tasks.

(Tr. 22.)  In doing so, the ALJ specifically highlighted evidence that Ms. Murray had "very little mental health treatment" and no "acute symptoms or episodes of decompensation leading to emergent or inpatient treatment," with "generally normal" examination findings and treatment records showing "improvement with treatment with some residual anxiety and some issues with rapid heartbeat or palpitations."  (Tr. 25.)  It was in that context that the ALJ found the state agency psychological opinions to be "consistent and supported by" the medical examinations and Ms. Murray's reported symptoms, limitations, and activities.  In context, the undersigned concludes that the ALJ's explanation as to why she found the state agency opinions "generally persuasive" was sufficient to address supportability and consistency in keeping with the regulations.  *See McCarty v. Comm'r of Soc. Sec.*, No. 4:24-cv-00451-DAC, 2024 WL 4695900 at *8 (N.D. Ohio Nov. 6, 2024) (finding an ALJ "is not required to use specific phrasing referencing the regulations," but that ALJ decisions must be read "as a whole and with common sense") (citing *Sovey v. Kijakazi*, No. 5:20-CV-00386-MAS, 2022 WL 447052, at *4 (E.D. Ky. Feb. 9, 2022) (collecting cases rejecting "magic words" arguments)).

In her reply brief, Ms. Murray argues that: the ALJ's analysis is insufficient because she does not "mention or otherwise discuss the actual mental limitations opined by Drs. Kennedy

and Williams," which "removes the necessary link between the evidence of record and the statements provided by these psychologists" (ECF Doc. 10, p. 2); the ALJ failed to "discuss what evidence is supportive of" the state agency opinions because "there is no discussion by the ALJ in the decision linking [specific medical exams] to [the] opinions" (*id.*); and the ALJ's "discussion of the evidence fails to inform the reader *how* the opinions of Drs. Kennedy and Williams are inconsistent with the evidence of record" (*id.* at p. 3 (emphasis in original)).

As to the first two arguments, the simple question before this Court is whether the ALJ's decision was supported by substantial evidence and adequately explained.  Regardless of whether additional discussion could have further explained the reasons for the ALJ's findings, this Court must uphold the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  While a more specific discussion of the limitations articulated in the opinions or the clinical examination findings that support the opinions may have further elucidated the ALJ's discussion of her persuasiveness finding, the undersigned concludes that the existing discussion and analysis was sufficient.

As to the third argument in Ms. Murray's reply brief—that the ALJ failed to discuss how the psychological opinions were "inconsistent with the evidence of record"—the undersigned observes that the ALJ found the opinions to be "generally persuasive" and "consistent" with the record.  (Tr. 26.)  Further, it appears that this argument dovetails with Ms. Murray's separate argument that the ALJ erred, in violation of Social Security Ruling (SSR) 96-8p, when she did not adequately explain her reasons for failing to adopt portions of the state agency opinions that "conflict" with the limitations in the RFC.  The undersigned turns next to that argument.

### 3.     Any Failure to Explain a Conflict Under SSR 96-8p Was Harmless Error

Ms. Murray argues that the ALJ erred when she found the state agency psychological opinions "generally persuasive" without also "providing reasons why their opinions were not

adopted in full." (ECF Doc. 7, p. 16.) Specifically, Ms. Murray asserts that the ALJ violated SSR 96-8p when she adopted mental RFC limitations that conflict with limitations from the state agency opinions without explaining why the conflicting limitations in the state agency opinions were not adopted. (*Id.* at p. 15.) The Commissioner responds that there was no conflict between the limitations in the state agency opinions and the limitations in the RFC, and that any potential error is harmless. (ECF Doc. 9, pp. 14-22.)

It is undisputed that an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Even where an opinion was given great weight, the Sixth Circuit has held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015).

Nevertheless, Social Security Ruling (SSR) 96-8p requires an ALJ to consider all medical opinions in the RFC assessment and, where the assessment "conflicts with an opinion from a medical source," the ALJ "must explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer, 774 F. Supp. 2d at 881* (citing SSR 96-8p). And where it has been shown that "SSA fail[ed] to follow its own regulations," the Sixth Circuit has explained that the "decision of the Commissioner will not be upheld" if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746 (citing *Wilson*, 378 F.3d at 546–47)) (internal quotation marks omitted).

Here, the ALJ found Ms. Murray was capable of performing: "routine tasks with detailed but uninvolved instructions, no contact with the public, occasional interactions with coworkers,

occasional interactions with supervisors, and occasional changes in work processes or tasks."

(Tr. 22.)  In contrast, the state agency consultants opined that Ms. Murray could: understand and

follow "simple instructions (i.e., perform one and two step tasks)"; make "simple decisions";

perform "simple, routine, repetitive tasks in a stable environment"; "interact appropriately with

the general public"; "get along with others in the workplace"; and "meet basic mental demands

on a sustained basis despite the limitations resulting from the impairments."  (Tr. 71, 79-80.)

Ms. Murray focuses her substantive arguments on two limitations, which she asserts conflict

with the ALJ's mental RFC: (1) the ability to "perform one and two step tasks"; and (2) the need

to work in a "stable environment."[3]  (ECF Doc. 7, pp. 16-19; ECF Doc. 10, pp. 3-4.)

The questions before the Court for each identified limitation are: first, whether the RFC

"conflicts" with the identified limitation, such that the ALJ must explain why she adopted a

conflicting limitation under SSR 96-8p; and, if so, whether the ALJ's failure to comply with SSR

96-8p prejudiced Ms. Murray on the merits or deprived her of a substantial right under *Rabbers*,

582 F.3d at 651.  The undersigned will address the two identified limitations in turn.

### i.    One and Two Step Tasks

Ms. Murray argues first that the ALJ erred when she adopted a limitation to the

performance of "routine tasks with detailed but uninvolved instructions" (Tr. 22) without

explaining "why she disregarded the more restrictive 'one and two step tasks' given by the state

agency reviewing psychologists" (ECF Doc. 7, p. 18).  In response, the Commissioner identifies

legal authorities suggesting there is not a clear distinction between limitations to "routine tasks"

and limitations to "one to two step tasks" (ECF Doc. 9, pp. 16-18), and further argues that any

---

[3] Ms. Murray also makes a conclusory assertion that the ALJ's failure to adopt a limitation to "simple decisions" also violated SSR 96-8p (ECF Doc. 7, p. 16; ECF Doc. 10, p. 4), which the undersigned finds was underdeveloped and therefore waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

error in not including a limitation to "one to two step tasks" would be harmless because the VE identified unskilled jobs that could be performed with that limitation (*id.* at pp. 18-19).

As an initial matter, the undersigned notes that the state agency psychological examiners actually incorporated two task-related limitations into their psychological opinions, both an ability to "understand, retain, and follow simple instructions (i.e., perform one and two step tasks)" and an ability to "perform simple, routine, repetitive tasks."  (Tr. 71, 77-78.)  The ALJ's RFC used slightly different language, limiting Ms. Murray to performing "routine tasks with detailed but uninvolved instructions."  (Tr. 22.)  In determining whether the ALJ violated SSR 96-8p, the first question is whether there is a "conflict" between (1) an ability to perform both "one to two step tasks" and "simple, routine, repetitive tasks" and (2) an ability to perform "routine tasks with detailed but uninvolved instructions."

Ms. Murray cites *Green v. Comm'r of Soc. Sec.*, No. 3:20-CV-01623-JGC, 2022 WL 610643 (N.D. Ohio Mar. 2, 2022), in support of her argument that "[t]he ALJ's rejection of the opinions of the state agency reviewing psychologists is harmful."  (ECF Doc. 7, p. 17.)  The *Green* court addressed a situation where an ALJ had adopted an RFC limitation to "simple tasks" after finding a medical opinion calling for a limitation to "1-2 step tasks" persuasive.  *See Green*, 2022 WL 61043, at *4.  The *Green* court observed that the parties "appear[ed] to agree" that the two limitations were different but noted that some courts found the terms "distinct" while others found the terms "interchangeable."  *Id.* (citations omitted).  Ultimately, the undersigned finds the unpublished *Green* decision to be of limited assistance in this case, first because the *Green* court considered different RFC language—i.e., "simple" vs. "1-2 step", instead of "one to two step" plus "simple, routine, repetitive" vs. "routine" with "detailed but uninvolved instructions"—and second because the *Green* court did not apply SSR 96-8p or consider whether an "error

30

prejudice[d] a claimant on the merits or deprive[d] the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651.[4]

Conversely, the Commissioner cites to other district court cases for the proposition that an RFC limitation to one to two step tasks "is not inconsistent with the ability to perform jobs with reasoning Level 2."  (ECF Doc. 9, p. 19 (quoting *Russell v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-291, 2014 WL 1333262, at *15 (N.D. Ohio Mar. 31, 2014); citing *Joseph B.G. v. Comm'r Soc. Sec.*, No. 2:23-cv-3276, 2024 WL 2889083 (S.D. Ohio June 10, 2024)).)

Under the Dictionary of Occupational Titles ("DOT"), all jobs are assigned a General Educational Development ("GED") score, which considers the reasoning, mathematical, and language development required for satisfactory job performance.  *See* Dictionary of Occupational Titles, Components of the Definition Trailer, 1991 WL 688702 (1991).  Reasoning development is divided into six levels.  *Id*.  Levels 1 and 2 are defined as follows:

> Level 2: Apply commonsense understanding to carry out <u>detailed but uninvolved written or oral instructions</u>. Deal with problems involving a few concrete variables in or from standardized situations.

> Level 1: Apply commonsense understanding to carry out <u>simple one- or two-step instructions</u>. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

*Id*. (emphasis added).

Considering the DOT language defining Reasoning Levels 1 and 2, it is noteworthy that the state agency opinions in this case include a limitation to "simple instructions (i.e., perform one and two step tasks)"—generally tracking the DOT definition of Reasoning Level 1—while the RFC limitation to "routine tasks with detailed but uninvolved instructions" generally tracks

---

[4] The court in *Green* applied a "logical bridge" analysis, without finding a conflict under SSR 96-8p or that the plaintiff was prejudiced or denied a substantial right.  *Green*, 2022 WL 61043, at *4-5.  Further, as the Commissioner observed, the ALJ in *Green* had found the relevant opinion "persuasive," while the ALJ in this case only found the opinions "generally persuasive."  (ECF Doc. 9, p. 16 (citing Green, 2022 WL 61043 at *3).)

the DOT definition of Reasoning Level 2.  While an argument could be made that the state

agency consultants' additional opinion that Ms. Murray could perform "simple, routine,

repetitive tasks" expands their overall findings to include the performance of work at Reasoning

Level 2, *see, e.g., Russell*, 2014 WL 1333262, at *15 (finding a limitation to routine tasks and

one-or-two-step instructions consistent with Reasoning Level 2), the undersigned finds the

language of the state agency opinions and the RFC track closely enough to the DOT's language

to support a finding that the mental RFC "conflicts" with the state agency opinions finding

Plaintiff can "perform one and two step tasks," and that SSR 96-8p thus required the ALJ to

explain why that part of the state agency opinions was not adopted.  *See* 61 Fed. Reg. at 34478.

There is no dispute that the ALJ failed to explain why she adopted a limitation to "routine

tasks with detailed but uninvolved instructions" instead of a limitation to "simple instructions

(i.e., perform one to two step tasks)."  (Tr. 26.)  The undersigned therefore finds that the ALJ

failed to meet the requirements of SSR 96-8p.  But the Commissioner argues that any such

failure is harmless error because the ALJ's decision "would still be supported" if the ALJ

included an RFC limitation to "one to two step tasks" because the VE identified available jobs at

Reasoning Level 1.  (ECF Doc. 9, p. 18.)  Specifically, the Commissioner notes that the VE

found an individual with the limitations described in the RFC could work as a laborer, a job for

which at least 426,000 positions exist in the national economy (Tr. 48-49), explaining that the

DOT classifies "laborer" at Reasoning Level 1.  (ECF Doc. 9, p. 18-19, n. 6 (citing DICOT

732.687.030).)

Where "an agency has failed to adhere to its own procedures," the Sixth Circuit has

explained that courts "will not remand . . . unless 'the claimant has been prejudiced on the merits

or deprived of substantial rights because of the agency's procedural lapse.'"  *Rabbers*, 582 F.3d

32

at 654 (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  Although Ms. Murray generally asserts that the ALJ's failure to adopt an RFC limiting her to one to two step tasks is "harmful" (ECF Doc. 7, p. 17), she does not explain how she was "prejudiced on the merits" or "deprived of a substantial right" by the ALJ's failure to comply with SSR 96-8p.  The Commissioner's harmless error argument suggests that Plaintiff cannot make that showing, since the VE testified to the availability of over 400,000 laborer jobs at Reasoning Level 1, with the DOT definition indicating that such jobs can be performed by a person who is able "to carry out simple one- or two-step instructions."  *See* 1991 WL 688702.

Under Social Security regulations, Ms. Murray is not disabled if, based on her vocational factors and RFC, she is capable of performing other work that exists in significant numbers in the national economy.  20 C.F.R. § 404.1520.  The Commissioner has the burden to establish that Plaintiff can perform other work in significant numbers in the national economy.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  Congress did not define "significant" in the Social Security Act.  Nor has the Commissioner defined the term by rule.  In the absence of a statutory or regulatory command, the Sixth Circuit has said that the ALJ must make the determination on a case-by-case basis.  *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Nevertheless, courts applying this standard in the Sixth Circuit have found job numbers well below the 426,000 laborer jobs available in this case to be "significant" under the regulations.  *See, e.g., Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (32,000 jobs); *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (6,000 jobs); *Nejat v. Comm'r of Soc. Sec.*, 359 F. Appx 574, 579 (6th Cir. 2009) (2,000 jobs).  The undersigned therefore finds that a significant number of jobs exist in the national economy that Plaintiff could perform, even with a one to two step task limitation.

For the reasons set forth above, the undersigned concludes that there was a conflict between the state agency psychological opinions and the mental RFC sufficient to warrant explanation under SSR 96-8p, but that the ALJ's failure to incorporate a limitation to performing "one to two step tasks" or explain her reasoning for leaving out that limitation was harmless error that neither prejudiced Plaintiff on the merits nor deprived her of a substantial right because the VE testimony establishes that a significant number of jobs were available in the national economy, even with an added limitation to the performance of "one to two step tasks." *See Joseph B. G.*, 2024 WL 2889083, at *5 ("Because the evidence establishes that Plaintiff could perform a significant number of jobs even if the ALJ had limited him to one- to two-step tasks, any error the ALJ committed by omitting that limit from Plaintiff's RFC was harmless.").[5]

ii.    **Stable Environment**

Ms. Murray also argues that the ALJ erred under SSR 96-8p when she adopted an RFC limiting Plaintiff to "occasional changes in work processes or tasks" without explaining why the RFC diverged from the psychological consultants' opinion that Plaintiff could perform specified tasks "in a stable environment."  (ECF Doc. 7, pp. 18-19; ECF Doc. 10, p. 4.)  She relies on a definition of "stable environment" articulated in an unpublished district court case out of California to argue that she would be unable to perform the jobs identified by the VE if she were limited to performing tasks in a "stable environment."  (ECF Doc. 7, pp. 18-19 (citing *Jamario H. v. Kijakazi*, No. 20-CV-09244-RMI, 2022 WL 4280642, at *4 (N.D. Cal. Sept. 15, 2022)).) The Commissioner asserts that this argument should be rejected because the relevant definition

---

[5] The undersigned further observes that Ms. Murray's failure to offer a developed argument as to the harm she allegedly suffered as a result of the ALJ's procedural error may also be sufficient grounds to reject her argument that the ALJ erred under SSR 96-8p.  *See Joseph B.G.*, 2024 WL 2889083, at *5 ("Plaintiff bears the burden of showing that the outcome would have been different if the ALJ had included in his RFC the one- to two- step task limit."); *Davis*, 2023 WL 5214114, at *3 (rejecting the plaintiff's SSR 96-8p argument in part because she did not indicate "in any way how the ALJ's alleged failure to follow the regulation was prejudicial to her claim") (citing *Hodson v. Berryhill*, No. 317CV00096GNSCHL, 2018 WL 1558106, at *3 (W.D. Ky. Mar. 30, 2018)).

34

was adopted by the ALJ in the California case and was not otherwise adopted by the court, which remanded the case for failure to develop the record.  (ECF Doc. 9, p. 21.)

As an initial matter, "stable environment" is not a term that is defined in the DOT, the Selected Characteristics of Occupations ("SCO"), or in the relevant medical opinions.  Thus, it is not clear what type or frequency of workplace changes the consultants intended to permit or exclude by limiting Ms. Murray to a "stable environment."  This is of concern because "SSA guidance states that VE testimony 'generally should be consistent with the occupational information supplied by the DOT'" and "the Commissioner's internal manual instructs ALJs 'not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise.'"  *Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *20 (N.D. Ohio Apr. 11, 2024) (quoting SSR 00-4p and HALLEX 1-2-6-74(C)); *see also Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted* 2022 WL 716105 (N.D. Ohio Mar. 10, 2022) (noting that "a VE's testimony must be based on her own vocational expertise and/or the information in the [DOT and SCO] and <u>cannot</u> be based on conclusions outside of her expertise, assumptions that are not clearly described on the record, or assumptions or definitions that are inconsistent with the SSA's policies or definitions.") (citing SSR-004p) (emphasis in original).

Instead of adopting the undefined term "stable environment" as an RFC limitation, the ALJ adopted a limitation to "occasional changes in work processes or tasks."  (Tr. 22.)  Under the DOT and SCO, that means Plaintiff may only perform jobs at which changes in work processes or tasks occur up to one-third of the time.  *See Beasley v. Berryhill*, No. 5:16-CV-00108-LLK, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining that "[t]he terms 'occasional' and 'frequent' are terms of art in Social Security law [and] '[o]ccasional' means

occurring from very little up to 1/3 of the time") (citing Social Security Ruling (SSR) 83-10, 1983 WL 31251); DICOT 979.687-034, Appendix C, 1991 WL 688702 (2016); SCODICOT Appendix C & D.  It is worthy of note that the DOT definition for Reasoning Level 1 indicates that workers must be able to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  *See* 1991 WL 688702.  Thus, the limited exposure to workplace change under the ALJ's RFC appears to be generally consistent with the limited exposure that might be expected in a Reasoning Level 1 job.

Other than citing to an inapposite California case,[6] Plaintiff has not articulated any developed arguments or identified any binding legal authority that would support a finding of a "conflict" between the state agency psychologists' vague requirement for a "stable environment" and the ALJ's adopted limitation to "occasional changes in work processes or tasks."  The undersigned sees no conflict between the state agency psychologists' undefined limitation and the more specific and vocationally relevant language adopted in the RFC.  Thus, the undersigned finds that the RFC limitation to "occasional changes in work processes or tasks" does not conflict with the psychological consultants' more vague limitation to a "stable environment," and therefore did not require the ALJ to provide further explanation under SSR 96-8p.  Plaintiff's arguments that she was harmed or prejudiced by any such error are therefore not well-taken.

For the foregoing reasons, the undersigned finds Plaintiff has not met her burden to show that the ALJ's analysis of the persuasiveness of the state agency psychological opinions lacked the support of substantial evidence, failed to adequately articulate her findings, or included a

---

[6] Plaintiff argues that the Court should define "stable environment" to mean "there would be few changes, if any, in the day-to-day work setting and in the tools and/or work process used to accomplish the work." (ECF Doc. 7, p. 18 (quoting *Jamario*, 2022 WL 4280642, at *4).)  Not only does Plaintiff rely on a definition from an unpublished Ninth Circuit case not binding on this Court, but the Northern District of California did not actually adopt this definition.  Rather, the court in *Jamario* noted that the ALJ adopted Plaintiff's proposed definition in the RFC before proceeding to remand the case because the ALJ failed to develop the record.  *Jamario*, 2022 WL 4280642, at *4-5.

procedural error that prejudiced Plaintiff on the merits or deprived her of a substantial right.

Accordingly, the undersigned concludes that Plaintiff's first assignment of error lacks merit.

B.      **Second Assignment of Error: The ALJ Appropriately Evaluated the Persuasiveness of the Medical Opinion of Consultative Examiner Anne Greenberg, M.D.**

In her second assignment of error, Ms. Murray challenges the ALJ's determination that the medical opinion of consultative examiner Dr. Greenberg was "not persuasive," arguing that: the ALJ's supportability analysis was based on a misrepresentation of the record; the ALJ failed to sufficiently explain her finding that the opinion was "internally inconsistent"; and the ALJ's consistency analysis overlooked the possibility that Ms. Murray's severe mental impairments supported Dr. Greenberg's opined limitation to light exertional work.  (ECF Doc. 7, pp. 19-24.)  The Commissioner argues in response that the ALJ's analysis of Dr. Greenberg's opinion was supported by substantial evidence and adequately articulated.  (ECF Doc. 9, pp. 10-14.)

In finding Dr. Greenberg's opinion "not persuasive," the ALJ explained:

> Anne Greenberg, M.D., completed a consultative examination on May 19, 2022 [].
> She reported claimant had an extensive psychiatric history with diagnoses of
> anxiety, panic attacks with palpitations, and depression. She noted clamant's PTSD
> was diagnosed recently and that claimant goes to the psychiatrist 2-3 times a month.
> Dr. Greenberg stated claimant was also treated for goiter, with a needle aspiration
> planned, and hypothyroidism. She reported the claimant drank 1 ½ bottles of wine
> a day, but stopped in 2022. On examination Dr. Greenberg found the claimant
> weighed 256 pounds, had normal gait and stance, full squat, no reflex or sensory
> deficits, full strength, and 100% grip. Bilateral knee x-rays were negative. Claimant
> was diagnosed with thyroid goiter, anxiety, panic attacks, depression, PTSD,
> history of AA and nicotine use disorder. In a medical source statement, Dr.
> Greenberg found the claimant could perform a range of light work with lifting and
> carrying limited to 10-20 pounds, standing and walking limited to 4 hours out of 8,
> 1 hour at a time, and postural and environmental limitations []. The undersigned
> finds this opinion is not persuasive as it is internally inconsistent and is not
> supported by the other evidence of record. The claimant has no positive clinical
> findings on examination, yet Dr. Greenberg limits her to light work. The record
> also shows no medical examination findings in the longitudinal treatment records
> to support a limit[] to light work [].

(Tr. 25-26 (emphasis added) (citations omitted).)

In challenging the ALJ's analysis, Ms. Murray argues: (1) as to supportability, the ALJ misrepresented the evidence when she said Ms. Murray had "no positive clinical findings on examination"; (2) the ALJ failed to sufficiently explain her finding that the opinion was "internally inconsistent"; and (3) as to consistency, the ALJ erred in finding there were "no medical examination findings in the longitudinal treatment records to support a limit[] to light work" because the ALJ overlooked mental health treatment records that could support a limit to light work.  (ECF Doc. 7, pp. 19-24.)  The undersigned will address each argument in turn.

### 1.    Plaintiff Has Not Shown That the ALJ Misrepresented Evidence

Ms. Murray argues first that the ALJ's analysis of supportability—i.e., the extent to which a medical source's objective findings and supporting explanations support her opinion— relies on a misrepresentation of the records because the ALJ "rejected Dr. Greenberg's opinion on the basis that Plaintiff 'has no positive [clinical][7] findings on examination.'"  (ECF Doc. 7, p. 21 (citing Tr. 26).)  Plaintiff argues that this statement mischaracterizes the consultative examination report, which documented: a weight of 246 pounds; an elevated blood pressure of 122/80; a respiratory rate of 18 breaths per minute; the presence of a goiter on Plaintiff's neck; and diagnoses of PTSD, anxiety, panic attacks, and depression.  (*Id*. (citing (Tr. 352-53); ECF Doc. 10, pp. 4-5 (citing Tr. 351, 354-56).)

The Commissioner responds that "[t]he problem with Plaintiff's argument is that Dr. Greenberg did not indicate that any of those findings formed the basis for her opinion," instead leaving blank all of the portions of the assessment form where she was asked to "[i]dentify the particular medical or clinical findings" that supported her assessment and "why the findings support the assessment."  (ECF Doc. 9, p. 11 (citing Tr. 354-60).)

---

[7] Although Plaintiff's brief purports to quote the ALJ's written finding, the brief leaves out a word from the quoted language, which has been inserted in brackets here.  (*Compare* ECF Doc. 7, p. 21 *with* Tr. 26.)

Having considered the decision and the relevant evidence, the undersigned finds Plaintiff has failed to show that the ALJ misrepresented the consultative examination report when she observed that the report reflected "no positive clinical findings on examination." (Tr. 26.) First, the language in question explicitly refers to clinical examination findings, which would include Ms. Murray's recorded weight, blood pressure, and respiratory rate findings, but not her reported symptoms or diagnoses. *See, e.g.,* 20 U.S.C. § 416.902(g), (k)-(l) (defining objective medical evidence, including signs and laboratory findings). Second, the ALJ acknowledged Ms. Murray's recorded weight in her decision, but also accurately observed that the examination showed Ms. Murray "had normal gait and stance, full squat, no reflex or sensory deficits, full strength, and 100% grip" and that her "[b]ilateral knee x-rays were negative." (Tr. 25-26.)

While the ALJ's analysis did not specifically reference Ms. Murray's blood pressure or respiratory rate, the ALJ was not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley*, 397 F. App'x at 199. Here, the consultative examination report reflects that Ms. Murray reported a medical history "[n]egative for hypertension, diabetes, heart attack, other heart disease, asthma, emphysema, seizures, or head injury" (Tr. 351) and that Dr. Greenberg did not diagnose any physical impairments relating to Plaintiff's weight, blood pressure, or respiration (Tr. 354). In this context and considering the largely normal physical examination findings recorded in the report (Tr. 352-54), the undersigned finds substantial evidence supported the ALJ's observation that the consultative examination report contained "no positive clinical findings on examination."

### 2. The ALJ Adequately Explained Her Finding That Dr. Greenberg's Opinion Was "Internally Inconsistent"

Ms. Murray argues next that the ALJ erred in finding Dr. Greenberg's report "internally inconsistent" because the ALJ "never further describes what is internally inconsistent about the

examination of the findings made by Dr. Greenberg." (ECF Doc. 7, p. 23.)  The Commissioner argues in response that it is clear from the ALJ's analysis that her finding that the opinion was "internally inconsistent" referred to evident inconsistencies between Plaintiff's complaints and her physical examination findings.  (ECF Doc. 9, p. 12.)  The undersigned generally agrees. Directly after saying she found Dr. Greenberg's opinion "not persuasive as it is internally inconsistent," the ALJ explained: "The claimant has no positive clinical findings on examination, yet Dr. Greenberg limits her to light work." (Tr. 26.)  The ALJ's language clearly indicates that she found an internal inconsistency between Ms. Murray's normal examination findings and Dr. Greenberg's opinion that she should be limited to light exertional work.  The undersigned accordingly concludes that the ALJ adequately and logically explained this finding.

### 3.    The ALJ Adequately Considered the Consistency of the Opinion

Finally, Ms. Murray's argues that the ALJ's analysis of consistency—i.e., the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record—is flawed because the ALJ overlooked Ms. Murray's mental health records when she found there were "no medical examination findings in the longitudinal treatment records to support" a limit to light work, and because Ms. Murray's complaints and primary care examination findings "are consistent with Plaintiff experiencing palpitations, panic, and elevated blood pressure as symptoms of her mental impairments," which "further bolster's Dr. Greenberg's opinion that Plaintiff cannot handle medium work."  (ECF Doc. 7, pp. 23-24.)

To the extent Plaintiff is arguing that the ALJ's analysis is insufficient because it overlooks Ms. Murray's mental health records, the Commissioner argues "the argument should be rejected because Dr. Greenberg did not indicate that Plaintiff's mental impairments affected her physical functioning," and indeed "did not provide any explanation for her findings."  (ECF

Doc. 9, p. 13.)  And to the extent Plaintiff is arguing that the ALJ did not adequately consider the evidence relating to her physical impairments, the Commissioner asserts that the argument should be rejected because the ALJ discussed the relevant records and impairments, including state agency medical opinions finding Ms. Murray did not have severe physical impairments, and made a decision that was supported by substantial evidence.  (*Id.* at pp. 13-14.)

As an initial matter, it is observed that the question before this Court is not whether substantial evidence supports Plaintiff's desired findings.  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  Thus, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  That means Plaintiff must show that the ALJ's analysis and findings *lacked* the support of substantial evidence, regardless of whether there may also be substantial evidence to support Plaintiff's preferred findings.

The undersigned turns first to Ms. Murray's argument that the ALJ erred when she did not consider Plaintiff's mental health treatment records in support of her finding there were "no medical examination findings in the longitudinal treatment records to support" a limitation to light work.  (Tr. 26.)  Since the only "medical examination findings" identified in Plaintiff's brief to support this argument are mental status findings from two mental health treatment visits, both reflecting a depressed and anxious mood / affect (*see* ECF Doc. 7, pp. 23-24 (citing Tr. 458, 465)),[8] this Court must consider whether the ALJ's evident failure to consider the impact of those mental status findings on Ms. Murray's exertional capacity deprived her findings of the support of substantial evidence.  The undersigned concludes that it does not.

_____

[8] The other records identified by Plaintiff merely reference the symptoms and medical history Ms. Murray reported to her mental health providers.  (*See* ECF Doc. 7, pp. 23-24 (citing Tr. 439, 463, 471).)

Before analyzing Dr. Greenberg's opinion, the ALJ explicitly considered Ms. Murray's reports of panic attacks and elevated blood pressure, in addition to the primary care treatment records with examination findings noting a rapid heartbeat, palpitations, and elevated blood pressure.  (Tr. 23-25.)  The ALJ also considered treatment records relating to Ms. Murray's medically determinable physical impairments of thyroid goiter, fibroids, and obesity, explained her reasons for finding those impairments were not severe, and confirmed that those impairments were considered in assessing the RFC.  (Tr. 20-21.)  The ALJ additionally considered and found persuasive the opinions of the state agency medical consultants that Ms. Murray's physical medically determinable impairments were not severe.  (Tr. 21.)  In that context, the undersigned finds that substantial evidence supported the ALJ's finding that "no medical examination findings in the longitudinal treatment records" supported a limitation to light work.  The ALJ's evident failure to consider mental status findings showing a depressed and anxious mood / affect in making this finding does not deprive the finding of the support of substantial evidence.

Ms. Murray's reference to Social Security Rulings (SSRs) 83-14, 96-8p, and 83-10 does not change this analysis.  (ECF Doc. 7, p. 22.)  SSR 83-14 is a policy statement that "clarifies the distinction between exertional and nonexertional limitations" and explains how nonexertional limitations may affect the performance of work activities.  SSR 83-14, 1983-1991 Soc. Sec. Rep. Serv. 41, 1983 WL 31254, *1 (Jan. 1, 1983).  Although SSR 83-14 identifies mental activities as "nonexertional," it acknowledges that "some conditions (e.g., depression or a conversion reaction) may also affect a person's exertional capacity."  *Id.* at *2.  SSR 83-10 is a policy statement that reviews and clarifies the medical-vocational rules and defines an exertional limitation as "[a]n impairment-caused limitation which affects capability to perform an exertional activity."  SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 1983 WL 31251, *1, *5

42

(Jan. 1, 1983).  SSR 96-8p is a policy statement regarding RFC assessments.  SSR 96-8p, 61 Fed. Reg. at 34474.  In discussing exertional and nonexertional functions, SSR 96-8p states: "[E]ven though mental impairments usually affect nonexertional functions, they may also limit exertional capacity by affecting one or more of the seven strength demands. For example, a mental impairment may cause fatigue or hysterical paralysis." *Id.* at 34478.  While the identified language could arguably support a finding that a mental impairment *could* impact a person's exertional capacity, it does not support a finding in this case that the ALJ must consider the impact of mental status exams showing depressed and anxious mood on Plaintiff's exertional capacity in order to make findings that are supported by substantial evidence.

The undersigned turns finally to Ms. Murray's argument that her subjective complaints and primary care examinations "are consistent with Plaintiff experiencing palpitations, panic, and elevated blood pressure as symptoms of her mental impairments," which "further bolsters Dr. Greenberg's opinion that Plaintiff cannot handle medium work."  (ECF Doc. 7, pp. 23-24.) While this argument may support Plaintiff's contention that there was substantial evidence in the record to support a limitation to light exertional work, it does not support a further finding that the ALJ *lacked* substantial evidence to support her contrary finding.  The ALJ explicitly considered the subjective complaints and examination findings described by Plaintiff and found the medical examination findings in the longitudinal record were not consistent with an opinion limiting Ms. Murray to light work.  Because that finding was supported by substantial evidence and within the ALJ's "zone of choice," it is not this Court's role to overturn that finding.

For the foregoing reasons, the undersigned finds Plaintiff has not met her burden to show that the ALJ's analysis of the persuasiveness of the consultative examiner's medical opinion

lacked the support of substantial evidence or failed to adequately articulate her findings.

Accordingly, the undersigned concludes that Plaintiff's second assignment of error lacks merit.

## VII.    Recommendation

For the reasons set forth above, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

March 18, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).